FALCON DAM CONSTRUCTORS, Constructora Intercontinental, S. A., C. F. Lytle Company, Massman Construction Company, Foley Brothers and Anderson, Inc. (Formerly Foley Brothers, Inc.), Tellepsen Construction Company, Edward Peterson Company, Amis Construction Company, San Ore Construction Company, and Intercontinent Constructors, Inc.,

v.

The UNITED STATES.

No. 72-55.

United States Court of Claims.
July 12, 1956

---

1. As amended July 17, 1956.

John M. Martin, Beverly Hills, Cal., for plaintiffs. Frank L. Martin and Martin & Martin, Beverly Hills, Cal., were on the brief.

John B. Miller, Washington D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant. Alfred H. O. Boudreau, Jr., Washington D. C., was on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

MADDEN, Judge.[1]

The plaintiffs are seven American contractors, a joint venture named Falcon Dam Constructors, comprised of the seven American contractors, a Mexican corporation named Constructora Intercontinental, S. A., and a Delaware corporation, Intercontinent Constructors, Inc., owned by five of the American contractors, which corporation together with the other two American contractors, own all the stock of Constructora, the Mexican corporation. The occasion for the creation of this rather formidable array of juristic entities was the proposed building of a dam across the Rio Grande River, to be paid for partly by the United States and partly by Mexico, which dam was built and is named the Falcon Dam.

A treaty, 59 Stat. 1219–1267, was made between the United States and Mexico dated February 3, 1944, and a protocol supplementing the treaty and, expressly made a part of it, was signed on November 14. The treaty was ratified by the United States Senate on April 18, 1945, and proclaimed by the President on November 27 of that year. The treaty contemplated the construction of a series of dams on the Rio Grande, water allocation between the two nations, and flood control projects on the Colorado and Tia Juana Rivers. The provisions of the treaty relating to the Rio Grande River defined an International Boundary

1. Pursuant to an order of the court entered this date the prior opinion in this case rendered on June 5, 1956 has been vacated and this opinion substituted in its place.

and Water Commission which should have the status of an international body and should consist of a United States Section and a Mexican Section. Article 4 of the treaty allocated the use of the waters of the Rio Grande between the United States and Mexico. Article 5 was an agreement to jointly construct storage dams in the main channel of the Rio Grande. It provided that "the cost of construction, operation and maintenance of each of the * * * dams shall be prorated between the two Governments in proportion to the capacity alloted to each country for conservation purposes in the reservoir at such dam."

Article 6 of the treaty provided for studies, investigation and preparation of plans by the Commission and a report to the two Governments of the works to be built, the estimated cost, and the part of the works to be constructed by each Government. It said:

" * * * Each Government agrees to construct, through its Section of the Commission, such works as may be recommended by the Commission and approved by the two Governments. Each Government shall pay the costs of the works constructed by it and the costs of operation and maintenance of the part of the works assigned to it for such purpose."

Article 20 contained the following language:

"Each Government shall assume responsibility for and shall adjust exclusively in accordance with its own laws all claims arising within its territory in connection with the construction, operation or maintenance of the whole or of any part of the works herein agreed upon, or of any works which may, in the execution of this Treaty, be agreed upon in the future."

Minutes were made of the actions of the Commission. The minutes of the meeting of December 20, 1947, recite agreements as to the site, size and storage capacity of the dam which was to be known as the Falcon Dam. At a meeting on August 13, 1948, the preparatory work for the dam was allocated between the United States and the Mexican Sections of the Commission. The preparation of the plans and specifications for the entire dam was allocated to the United States Section which was to have this work done in the Office of the Chief Engineer of the Bureau of Reclamation of the United States. At a meeting on September 7, 1949, allocations of the specific items of construction work were made between the two Governments on the basis of the agreed allocation of estimated costs.

Invitations for bids were issued on September 15, 1950, the bids to be opened on October 30. The work to be undertaken and paid for by the United States was denominated Schedule No. 1, and that of Mexico, Schedule No. 2. The United States' share of the work amounted to 58.6 percent, which was the United States' percentage of the use of the water to be impounded by the dam. The Schedule 2 work to be paid for by Mexico was 41.4 percent of the entire work. According to the invitation, bids for the Schedule 1 work were to be made to the United States Commissioner, and those for the Schedule 2 work to the Mexican Commissioner. Separate contracts were to be made for the work covered by the two schedules.

Because of the savings which would result if the same contractor or cooperating contractors would get both contracts, the invitation permitted a bidder, in addition to making separate bids on the separate schedules, to make conditional bids, stating, for example, how much he would do the work on Schedule 1 for if a bidder specified by him in his conditional bid got the contract for Schedule 2.

The seven American contractors referred to earlier in this opinion, combining in a joint venture called Falcon Dam Constructors, submitted an unconditional bid of $8,600,980 on Schedule 1, and a bid of $7,801,064 on Schedule 1 if the contract on Schedule 2 should be awarded to Constructora Interconti-

nental, S. A. Constructora was a Mexican corporation which had been created by the seven American contractors because Americans could not obtain a contract with the Mexican Government. Constructora was owned, partly directly, and partly indirectly through ownership of a holding company, a Delaware corporation, Intercontinent Constructors, Inc., by the seven American contractors. Falcon Dam Constructors' alternative bid on Schedule 1 at the lower figure named above was accepted, which meant that Constructora's bid on Schedule No. 2 was accepted. A contract was executed between Falcon Dam Constructors and the United States for the Schedule 1 work, and a contract was executed between Constructora and Mexico for the Schedule 2 work.

After the completion of all the work under both contracts, Falcon Dam Constructors presented to the Commission a claim for damages allegedly suffered by it, in its Schedule 1 work, and by Constructora in its Schedule 2 work. The total claim was for $1,938,777. Of this amount, $977,295 was the alleged damage to Constructora for:

> "Increased costs due to failure of the United States Government to timely furnish drawings, materials, and equipment in conformity with the contract provisions and the express representations of the treaty, of the Commission, and of the United States upon which the contractors relied in the submission of their qualified and conditional bids pursuant to which awards of contracts for both Schedule No. 1 and Schedule No. 2 were made."

Nothing has been paid to Falcon Dam Constructors on its claim made to the Commission. The plaintiffs in this case sue for substantially the same amount for which Falcon Dam Constructors made claim to the Commission. The petition refers to delays occurring under both Schedule 1 and Schedule 2. Compensation for those occurring under Schedule 2, if recoverable, would belong to Constructora, the contractor on that work.

Both Constructora and Intercontinent Constructors, Inc., the Delaware corporation which held most of the stock of Constructora, are plaintiffs in this case.

■ The Government has moved for a summary judgment of dismissal as to Constructora and Intercontinent Constructors, pointing out that Constructora had no contract with the United States, but only with Mexico, and that Intercontinent Constructors had no contract at all, but was merely a stockholder in Constructora. As to Intercontinent Constructors, it seems plain that it has no proper place in this litigation. As a stockholder in a corporation which is not neglecting to enforce its rights, but is a party plaintiff in this very litigation, it can contribute nothing useful to the decision of the case.

The International Commission, in the allocation of the work and the expense of the project, allocated to the United States the cost of the drawings, and to the Chief Engineer of the United States Bureau of Reclamation, the task of making them. Some 88 drawings were already prepared when the bids were taken and the contracts were let. The "Special Conditions" common to both contracts, and therefore inserted in each contract, stated that additional drawings would be furnished as they became necessary or desirable, and, when furnished, would have to be followed.

There was also a "Special Condition" as to materials and equipment to be furnished by the Commission under both contracts. In one paragraph it listed the materials and equipment to be furnished under Schedule 1, i. e. the United States contract. In another paragraph it listed materials and equipment to be furnished under Schedule 2, i. e. the Mexican contract, and said that certain designated items would be furnished by the United States Section of the Commission, and certain other designated items by the Mexican Section.

■ The United States contract, Schedule No. 1, was, of course, made with the United States contractor, the joint

venture. The recital in it of the matters of interest to both contractors represented an economy of language, since that much of the writing could simply be duplicated in the two contracts. It also gave each contractor useful information as to what the arrangements inside the Commission were as to the allocation of work and materials not to be furnished by the contractors. The plaintiffs say that these statements amounted to a promise by the United States to the United States contractor, that it would furnish the Schedule 2 drawings and materials to the Mexican contractor, and that this promise was made for the benefit of the Mexican contractor, and gave it enforceable rights against the United States.

We think that the fact that these recitals were made in the United States contract, and also, presumably, *vice versa*, in the Mexican contract, to which the United States was not a party, was a matter of drafting convenience and that it added no significance to the fact, (already known to all parties, that in the international arrangements between the two nations, certain allocations had been made as to which nation was to furnish certain items for the dam. If there was an inclination on the part of the United States plaintiffs and their Mexican subsidiary to count more heavily on the United States furnishing these items on time than they would have counted on Mexico if the items had been allocated to Mexico, that inclination would have existed in any event, since the contractors already knew what the international allocation was.

We think that the recital in the United States contract of the terms of the international allocation did not amount to a promise to or for the benefit of a third person, not a party to that contract. The "Special Condition" common to both contracts meant that they should be applied, so far as relevant, to the parties to each contract, "as the case may be."

The plaintiffs also suggest that we, in effect, "pierce the corporate veil" and treat all of them as one entity and the two contracts as one contract. The whole arrangement, well known to the two governments, whereby the American enterprisers created, for the occasion, a Mexican corporation so controlled by them that the operation could be carried on as a single operation, was rather unreal. But the treaty provisions requiring each country to be responsible for its own, and only for its own, contracts were real enough and must be adhered to.

Our conclusion is that the plaintiff, Constructora Intercontinental, S. A., which contracted with Mexico, is suing the United States because the United States did not do what it agreed with Mexico to do.

In 28 U.S.C. § 1502, appears this language:

"Except as otherwise provided by Act of Congress, the Court of Claims shall not have jurisdiction of any claim against the United States growing out of or dependent upon any treaty entered into with foreign nations."

We think Constructora's claim grew out of the treaty with Mexico. The treaty provided for the building of dams such as the Falcon Dam; it created a Commission to administer the building of such dams; it was the entire legal basis for the agreement made by the United States Commissioner that the United States would do the things which were allocated to it to be done. The agreement was the implementation of the treaty. By the statute just quoted, Congress has withdrawn from litigation questions as to whether the United States has done what it agreed by treaty to do. If Mexico were suing on the contractual provisions of the treaty, we would be obliged to so hold and we must likewise so hold as to the plaintiff Constructora.

The Government's motion for a summary judgment of dismissal as to the plaintiffs Constructora Intercontinental, S. A., and Intercontinent Constructors,

Inc., is granted and the petition is dismissed as to them.

It is so ordered.

JONES, Chief Judge, and LARAMORE, WHITAKER and LITTLETON, Judges, concur.