KEENE CORPORATION, Plaintiff,

v.

The UNITED STATES, Defendant.

JOHNS–MANVILLE CORPORATION et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

EAGLE–PICHER INDUSTRIES, INC., Plaintiff,

v.

The UNITED STATES, Defendant.

GAF CORPORATION, Plaintiff,

v.

The UNITED STATES, Defendant.

UNR INDUSTRIES, INC., et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

FIBREBOARD CORPORATION, Plaintiff,

v.

The UNITED STATES, Defendant.

H.K. PORTER COMPANY, INC., Plaintiff,

v.

The UNITED STATES, Defendant.

Nos. 579–79C, 585–81C, 465–83C, 688–83C & 1–84C, 170–83C, 287–83C, 16–84C, 514–84C and 515–85C.

United States Claims Court.

April 6, 1987.

198

Harvey G. Sherzer, Washington, D.C., with whom were Robert M. Bruskin, Lewis M. Barr, Charles H. Samel and Anne M. Quigley, Howrey & Simon, Washington, D.C., for plaintiffs in Nos. 465–83C, 688–83C and 1–84C. Dennis H. Markusson, Robert D. Batson and Nancy E. Stead, Manville Corp., Littleton, Colo., of counsel.

H. Michael Semler, Washington, D.C., with whom were Benjamin A. Dinkins, Harold J. Engel, and Asst. Atty. Gen. Richard K. Willard, for defendant.

## ORDER

NETTESHEIM, Judge.

Defendant has moved to dismiss all the captioned actions other than *UNR Industries, Inc., et al.*, No. 16–84C, for lack of jurisdiction based on 28 U.S.C. § 1500 (1982). An order entered on February 13, 1987, limited the initial ruling on defendant's motion to the three cases pending as *Johns-Manville Corp. et al.*, Nos. 465–83C, 688–83C & 1–84C, because trial in No. 465–83C was scheduled to begin on April 20, 1987. Argument has been heard.[1]

1. Five of the other plaintiffs in these asbestos cases potentially are affected by the order en-

The genesis of defendant's motion was an order entered *sua sponte* on January 20, 1987, directing defendant to state its position on the applicability of 28 U.S.C. § 1500 concerning litigation brought by plaintiffs Johns-Manville Corporation and Johns-Manville Sales Corporation (collectively referred to as "Johns-Manville"). It is regrettable that this court raised the matter at such a late date. The earliest of the Johns-Manville cases was filed in 1983, and this court received them on transfer in July 1986. After defendant on January 15, 1987, described pending litigation in the United States District Court for the Northern District of California (which had been pending since 1981), this court, impressed with the similarity of the claims, entered its January 20, 1987 order.

For its part defendant's failure to file its motion earlier is outrageous. On August 1, 1980, defendant moved for summary judgment in *Keene Corp.*, Nos. 579–79C & 585–81C, based *inter alia*, on 28 U.S.C. § 1500. According to one of defendant's counsel, the argument was abandoned for "tactical reasons" in defendant's reply brief. Declaration of Paul Honigsberg, Feb. 26, 1987, ¶ 3. Defendant also referred to 28 U.S.C. § 1500 in 1983 in connection with a motion to dismiss in the nature of a motion for a more definite statement filed with respect to *Eagle-Picher Industries, Inc.*, No. 170–83C. The Government had elected not to pursue a section 1500 motion at that time, ostensibly because the pleadings were too indefinite. Declaration of Robert M. Hollis, Feb. 27, 1987, ¶¶ 3, 5. Significantly, defendant does not take the position that it was unaware that grounds existed to support a motion based on 28 U.S.C. § 1500 in the *Eagle-Picher* case; nonetheless, six weeks before the scheduled trial in the lead case, defendant demands dismissal of Johns-Manville's cases in this court unless Johns-Manville dismisses all of its direct and third-party litigation against the United States in federal district court.

As a court of limited jurisdiction, the United States Claims Court must be acute to statutes that deprive it of jurisdiction, such as 28 U.S.C. § 1500, which precludes the exercise of jurisdiction with respect to claims against the United States that are also pending in other courts. Even though section 1500 may be harsh, *see Corona Coal Co. v. United States*, 263 U.S. 537, 540, 44 S.Ct. 156, 156, 68 L.Ed. 431 (1924), the timing of the motion urging that the court refrain from exercising its jurisdiction was a matter within defendant's control. A jurisdictional motion can be made at any time, but it is unclear whether defendant would have waited until the case was presented to the United States Supreme Court to point out that the trial court lacked jurisdiction to proceed.

## BACKGROUND

The potentially affected parties in the asbestos cases pending in this court are displeased that the court *sua sponte* raised 28 U.S.C. § 1500 after they had engaged in extensive and costly pretrial proceedings since 1983. The record discloses, however, that no court has ruled, *sub silento* or expressly, on the subject. In these circumstances prudence dictates resolving all jurisdictional issues before trial.

In order to understand the labyrinthine procedural history of this issue, some terms shall be defined. "Later-filed suits" refer to actions filed elsewhere after suit was filed in the United States Court of Claims or United States Claims Court. "Earlier-filed suits" refer to actions filed in

---

tered herein. The court will not decide defendant's motion as to these plaintiffs until defendant has briefed further the issue whether the same claims are pending both in district courts and this court. However, it can be stated with some assurance that Keene Corporation, Nos. 579–79C & 585–81C, and Fibreboard Corporation, No. 514–84C, filed similar cases in other courts after having commenced their litigation in the United States Court of Claims or this

court. Eagle-Picher Industries, Inc., No. 170–83C, and H.K. Porter Company, Inc., No. 515–85C, filed similar actions both before and after suing in the Claims Court. GAF Corporation, No. 287–83C, sued in district court one day after filing its similar action in the United States Claims Court. Overall, the direct, third-party, and omnibus actions brought by all plaintiffs that are pending in district courts total over 300 separate cases.

other courts before a case was commenced in the Court of Claims or Claims Court.

With respect to suits filed after actions were begun in the Court of Claims or Claims Court, defendant argued in its August 1, 1980 moving brief in *Keene Corp.*, No. 579–79C, that 28 U.S.C. § 1500 barred the prosecution in the Claims Court of suit on the same claim later filed in district court. After defendant abandoned this argument on reply, the Court of Claims issued an unpublished order that did not discuss the issue. *Keene Corp. v. United States*, No. 579–79C (Ct.Cl. May 1, 1981) (per curiam) (order denying motion for summary judgment and granting leave to file first amended petition). This court ruled recently in *Johns-Manville Corp. v. United States*, No. 465–83C, slip op. at 17–19 & n. 2 (Cl.Ct. Mar. 6, 1987) (order granting and denying motion for judgment on the pleadings), that the May 1, 1981 order should be accorded law of the case effect as to its ruling that several breach of contract claims were cognizable by the Court of Claims, but declined to adhere to the doctrine insofar as the May 1, 1981 order allowed a claim for breach of a warranty of safe use. However, law of the case does not enter the picture when the judicial utterance is silent. *See Argus Chemical Corp. v. Fibre Glass-Evercoat Co.*, 812 F.2d 1381 (Fed.Cir.1987) (additional views of Nies, J.) (trial court correctly perceived that Federal Circuit's silence on issue was not law of the case); *cf. International Elec. Corp. v. United States*, 2 Cl.Ct. 570, 573, *aff'd mem.*, 727 F.2d 1120 (Fed.Cir.1983) (published opinion of Court of Claims appellate division considered law of the case by successor Claims Court when prior court expressly considered issue and said that it was unnecessary to reach it; Court of Claims also had denied motion for reconsideration on same ground); *Department of Natural Resources & Conservation v. United States*, 1 Cl.Ct. 727, 731 n. 2 (1983) (decision on jurisdictional argument considered and rejected in published order of Court of Claims law of the case in same case before successor Claims Court).

Moreover, the Court of Claims knew how to reject a section 1500 argument when defendant abandoned it on reply. In *Camero v. United States*, 170 Ct.Cl. 490, 493, 345 F.2d 798, 800 (1965), the Court of Claims said:

In the case at bar, defendant had included as one ground for its motion for summary judgment the assertion that, by virtue of 28 U.S.C. § 1500, the filing of the district court suit took away the jurisdiction of this court. At the time of oral argument of the present case, defendant announced that it had abandoned its position on jurisdiction. Furthermore, for the reasons expressed in *Tecon Engineers, Inc. v. United States*, ante, [170 Ct.Cl.] at p. 389, 343 F.2d 943, we hold that, regardless of the degree of similarity between the suit in the district court and the case at bar, the filing of the action in the district court did not affect the jurisdiction of this court over the present case.

(Footnote omitted.) *Camero* strongly suggests that the Court of Claims in *Keene Corp.* would have rejected defendant's argument based on section 1500 had it not been abandoned (or had defendant so announced at argument). (Correspondingly, Court of Claims precedent would have dictated the rejection of Keene Corp.'s weak argument that its claims were different merely because they sounded in tort in district court and contract in the Court of Claims.) Because the May 1, 1981 order was silent on the subject of section 1500, the consequence is that defendant has not made the same argument concerning later-filed cases before to the Court of Claims and obtained a ruling on it.

With respect to actions filed in other courts before suits on the same claims were filed in the Claims Court, defendant raised section 1500 again in 1983 before Judge Lydon in *Eagle-Picher Industries, Inc.*, No. 170–83C. (Although defendant's motion in the nature of a motion for more definite statement was consolidated for decision with a motion to dismiss in *GAF Corp.*, No. 287–83C, defendant's motion against *GAF* did not mention section 1500.) Defendant's moving papers in *Eagle-Pich-*

*er* say that defendant viewed itself as hampered from making a section 1500 motion because the complaints were nonspecific as to the particular judgments and settlements sued on. *See* Def's Br., No. 170–83C, filed May 24, 1983, at 5, 16–17, 19. Judge Lydon's order in *Eagle-Picher Industries, Inc. v. United States*, No. 170–83C (Cl.Ct. Sept. 15, 1983) (order denying motion to dismiss), did not speak to section 1500.

█ Neither the 1981 *Keene* order nor the 1983 *Eagle-Picher* order is law of the case on section 1500. More to the point is plaintiffs' contention that defendant lulled them along for over three years. That is correct. Plaintiffs also are correct that the Court of Claims decision in *Tecon Eng'rs, Inc. v. United States*, 170 Ct.Cl. 389, 343 F.2d 943 (1965), *cert. denied*, 382 U.S. 976, 86 S.Ct. 545, 15 L.Ed.2d 468 (1966), is controlling and binding authority that section 1500 does not apply in respect to later-filed suits. *Tecon Engineers* and its progeny encouraged plaintiffs that they would be allowed to pursue the same claims as torts in district court as long as their Claims Court contract actions were filed earlier. If the Federal Circuit is to reexamine *Tecon Engineers* after over 20 years, these are the cases in which to do it. Defendant has expended awesome personnel and monetary resources to defend the same claims at the same time in the Claims Court and district courts.

There was justification for some delay in raising section 1500. With respect to later-filed suits, *Tecon Engineers* would have been dispositive of any motion before the Court of Claims. However, defendant could have moved in *Keene Corp.* after the case was transferred to the Claims Court in late 1982 and asked Judge Lydon to certify the question to the Federal Circuit, since *Tecon Engineers* is binding on the Claims Court. With respect to earlier-filed suits, defendant said in 1983 before Judge Lydon that it was confronted in *Eagle-Picher Industries, Inc.*, No. 170–83C, with "18,000 separate suits for indemnity." Def's Br. filed July 3, 1983, at 7. On this basis defendant had argued in its moving brief

that without more information as to claims and amounts of settlements or judgments it could not judge the applicability of 28 U.S.C. § 1500. Judge Lydon took the reins in his September 15, 1983 order by instructing the parties that the case should proceed on a representative basis:

> [I]t is felt that the better answer to handling these potentially large and complex litigations is for counsel to work together to reach agreement on an approach that will enable the matters to be tried on a representative basis so as to present for determination the issues the parties feel will dispose of the litigations without the necessity of dealing with every identical contract and every judgment and settlement. It would seem unreasonable to have to deal with contracts between the parties going back to the 1930's and with some 34,000 judgments or settlements. If representative situations, agreed to by the parties, can be set forth in detail, and tried if necessary, much needless work, time and expense of all concerned can be avoided. The court stands ready to work with counsel in this regard.
>
> . . . .
>
> It is further ordered that counsel for the parties commence working on efforts to reach a representative approach to litigating the matters in suit. . . .

*Eagle-Picher Industries, Inc. v. United States*, No. 170–83C, slip op. at 3. Thus, only after this order entered and the parties commenced to develop test cases was defendant in a position to argue that 28 U.S.C. § 1500 bars Claims Court jurisdiction over test cases when the same claims are pending elsewhere differentiated only by facts particular to different claimants, shipyards, and contracts. This possible justification, of course, does not excuse filing the motion in 1987.

Defense counsel forthrightly stated in argument that this court's suggestion prompted its motion, so that any justification is not claimed. The equities preponderate in Johns-Manville's favor. Jurisdictional determinations may not be tempered by notions of equity, but the enforcement of jurisdictional orders should be influ-

enced by considerations of fairness. The order that follows has been fashioned in this spirit.

## FACTS

1. *Theories of relief in cases brought by Johns-Manville*

The earliest of the non-Claims Court cases brought by Johns-Manville, *Johns-Manville Sales Corp. v. United States*, No. C 81 4561 RFP (N.D.Cal., filed Dec. 7, 1981), sought recovery of amounts Johns-Manville had paid to defend and settle a claim by John C. Robinson for injuries allegedly suffered from exposure to asbestos-containing products supplied by Johns-Manville under contracts with the Government. This case will be referred to as "the Robinson case." The complaint pleaded claims under the Federal Tort Claims Act, §§ 1346(b), 2671–2680 (1976), based on the Government's negligence with regard to asbestos-containing products; negligence in breaching an implied warranty of fitness of the asbestos sold to Johns-Manville and an implied warranty of safety based on the Government's design of asbestos-containing products; and negligence in failing to reveal superior knowledge of the health hazards associated with asbestos. The complaint also alleged a fifth amendment taking. All of these claims except the taking claim were dismissed by order of January 27, 1983, for failure to file an administrative claim, as required by the Federal Tort Claims Act. The taking claim, as well as a later-added maritime law claim, were dismissed by order of December 17, 1984, following Johns-Manville's voluntary agreement to withdraw them. By order dated January 9, 1984, the court granted Johns-Manville's motion to file an amended complaint after an adequate administrative filing of its tort claims had been made.

The amended complaint, filed on January 19, 1984, made four claims under the Federal Tort Claims Act and one under the fifth amendment. Johns-Manville alleged that Mr. Robinson's injuries resulted from the Government's breach of duty owed both to Johns-Manville and to Mr. Robinson as a vessel owner to exercise due care in the use of asbestos-containing products. The Government allegedly breached implied warranties that 1) Johns-Manville would not be held liable for damages resulting from compliance with government-mandated specifications and 2) asbestos-containing products would be used in a safe manner. Johns-Manville also revived its taking claim, but later dropped it along with its admiralty claim in responding to the Government's motion to dismiss the amended complaint. *See Johns-Manville Sales Corp. v. United States*, 662 F.Supp. 443, 445 n. 2 (N.D.Cal.1985) (order denying motion to dismiss). In ruling on that motion, the district court held that the remaining claims were viable, but required that Johns-Manville plead proximate causation more specifically. *Id.* at 443. Johns-Manville complied in a second amended complaint filed on October 3, 1985. The district court is now considering defendant's motion to reconsider the denial of its motion to dismiss or to certify the order for interlocutory appeal.

There are 59 cases pending in the Eastern District of Virginia in which Johns-Manville and other asbestos-product manufacturers have brought in the United States and a shipyard operator as third-party defendants. Johns-Manville says that these cases were filed prior to August 26, 1982, which is prior to commencement of its Claims Court cases. These third-party actions allege that the asbestos-product manufacturers, defendants and third-party plaintiffs, are entitled, if found liable for the individual plaintiffs' claims for asbestos-related injuries, to indemnification by the United States, third-party defendant, since the manufacturers' negligence was secondary to that of the Government's. The manufacturers charge that the Government specified asbestos-containing products for use in the shipyard, supplied the products to the shipyard, determined their use in the shipyard, supervised the work, inspected the facilities, and was responsible for maintaining a safe working place. Claims for breach of warranties of safe use, merchantability, and fitness for a particular purpose are pleaded, and Johns-

Manville also claims that the Government breached its duties to maintain a safe work place and to enforce health standards.[2]

Based on the same theories as in the Robinson case, *Johns-Manville Sales Corp. v. United States.*, No. C83–798T (W.D. Wash., filed Oct. 15, 1982), sought indemnification of amounts paid to Leonard Herrman. The case was dismissed for lack of prosecution on September 27, 1984.

The filing of three cases in the Claims Court then followed. Johns-Manville sought in each suit indemnification for amounts that it had paid or may be liable to pay to individuals in settlement of claims for injuries allegedly caused by exposure to asbestos-containing products. The first complaint *Johns-Manville Corp. et al. v. United States*, No. 465–83C (Cl.Ct., filed July 19, 1983), made ten claims, one of which Johns-Manville has dropped. Indemnification was sought for Johns-Manville's liabilities for injuries to shipyard workers from exposure to asbestos during World War II based, *inter alia*, on an implied contract to indemnify created by 1) the mandatory nature of the contracts to supply asbestos, 2) the parties' intent that Johns-Manville not bear liability for injuries, 3) the Government's control of shipyard conditions, 4) the bailment by the Government of asbestos, and 5) limitations placed by the Government on the amount of liability insurance war contractors could carry. Additionally, Johns-Manville based claims on implied warranties that products complying with contract specifications would be free of defects and that the Government would enforce safety standards. The Government also was said to have a duty to disclose knowledge that shipyard workers were being exposed to dangerous concentrations of asbestos dust. The complaint contained claims for reformation to conform the contract to the parties' agreement to indemnify Johns-Manville for third-party liabilities and for reformation based on mutual mistake, for equitable adjustment because of increased performance costs, and for a fifth amend-

ment taking growing out of Johns-Manville's payment of injury claims. Upon defendant's motion for judgment on the pleadings, this court dismissed all but four claims. *Johns-Manville Corp. v. United States*, 12 Cl.Ct. 1 (Cl.Ct.1987). Outstanding are claims for breach of an implied warranty that products complying with government specifications would be free from defects and safe and for breach of a duty to inform Johns-Manville of the Government's superior knowledge concerning the actual and potential risks of asbestos and the risk to shipyard workers' health from asbestos exposure. The reformation claim is still viable as to mutual mistake about the level of safe exposure to asbestos and health risks, and the claim for equitable adjustment also remains.

*Johns-Manville Corp. et al. v. United States*, No. 688–83C (Cl.Ct., filed Nov. 16, 1983), also demands indemnification for amounts paid and potentially payable by Johns-Manville to persons allegedly injured by exposure to asbestos after 1963. Here Johns-Manville makes ten claims, six of which are repetitious of breach of implied warranty, implied contract to indemnify, and reformation claims made in 12 Cl.Ct. 1. Making its first appearance in Claims Court actions is a claim for breach of warranty to use products safely arising from the Government's control of specifications and of the conditions in which the products were used. Johns-Manville also contends that the various breaches of warranties injured Johns-Manville as an intended beneficiary and as a third-party beneficiary of its supply contracts. An additional implied-in-fact contract to indemnify for injuries from post–1963 exposures allegedly grew out of the Government's initial requirement of contract compliance and its continued control over the asbestos products from the time of contract until 1964.

*Johns-Manville Corp. et al. v. United States*, No. 1–84C (Cl.Ct., filed Jan. 3, 1984), seeks recovery for amounts paid in satisfaction of claims brought against

---

2. The foregoing is drawn from the third-party complaint in *Sacks v. Johns-Manville Corp. et*

*al.*, No. 81–436–N (E.D.Va., filed May 15, 1981).

Johns-Manville for asbestos-related injuries where the claimants' exposure was not restricted to a particular time period. Eight of the nine claims in this suit were contained in No. 465–83C. The new claim is a variation on a theme. Johns-Manville alleges that the implied contract to indemnify arising from mandatory compliance with supply contracts is extended to exposure during later "rip-out" operations also under exclusive control of the Government.

Four months after filing its third suit in the Claims Court, Johns-Manville brought two additional actions against the United States for recovery of damages incurred in suits filed by Hessuph W. Sexton, alleging exposure from 1944 to 1975, *Johns-Manville Corp. v. United States*, No. 84–C–893 (D.Colo., filed Apr. 24, 1984), and by Philsun Owen, alleging exposure from 1941 to 1945 and 1951 to 1959, *Johns-Manville Corp. v. United States*, No. 84–C–894 (D.Colo., filed Apr. 24, 1984). These suits, referred to as the "Sexton" and "Owen" cases, originally were filed in the District of Colorado, but were transferred to the Central District of California, becoming, respectively, Nos. CV–86–5338–PAR(B) and CV–86–5337–TJH(K). The Sexton and Owen cases, filed under the Federal Tort Claims Act, allege essentially the same bases for relief as in the Robinson case.

### 2. *Facts pleaded in actions brought by Johns-Manville*

When initially filed on December 7, 1981, the claims in the Robinson case were based on allegations that the Government knew of the harm of exposure to asbestos, required its use in products purchased from Johns-Manville, solely controlled the products by requiring compliance with its written specifications, and controlled the use of the products through operating shipyards and setting standards for safe levels of exposure to asbestos. Mr. Robinson suffered injuries allegedly from exposure to asbestos products manufactured by Johns-Manville during his employment in Navy shipyards from 1965 to 1976. In October 1981 Johns-Manville settled Mr. Robinson's personal injury suit for $45,500. In the second amended complaint filed on October 3, 1985, Johns-Manville reiterated its allegations as to safety standards, adding that they were not enforced, and repeated the allegations of government control of shipyards, adding that access to the yards was restricted. Johns-Manville also added allegations that it was compelled to enter contracts for the supply of asbestos-containing products; that the Government knew of the health risks caused by the lack of enforcement of safety standards; that Johns-Manville initiated worker education programs in 1964 when it became aware of the health risks of exposure; that the Government knew or should have known of Johns-Manville's potential liability caused by government actions in shipyards; and that Mr. Robinson, in fact, was exposed to excessive concentrations of asbestos supplied by Johns-Manville.

The three suits brought by Johns-Manville in the Claims Court grow out of a similar factual nexus since they allege that compliance with contracts to supply asbestos was mandated by the Government; that the Government established, but knowingly failed to enforce, safety standards; and that the Government had exclusive control of shipyard working conditions and limited access to, or distorted information about, those conditions.[3] In Nos. 688–83C and 1–84C, there are allegations similar to those made in the Robinson case that Johns-Manville discovered the risk of asbestos exposure in 1964 and then took measures to educate asbestos workers.

The allegations of the third-party suits, as exemplified in Johns-Manville's model third-party complaint, and the three Johns-Manville Claims Court suits overlap as to control of shipyards by the Government,

---

**3.** The working conditions of concern in No. 688–83C, of course, were those after 1963; in No. 465–83C the conditions were those during World War II; and in No. 1–84C the conditions of interest are not time-restricted.

*See* Appendix B to Def's Br. filed Mar. 11, 1987, for an extensive tabular presentation of the similarities in the factual bases of the claims made in the three Claims Court cases and the second amended complaint in the Robinson case.

the promulgation by the Government of safety standards and procedures in those shipyards, and the failure to enforce those standards. Facts unique to the third-party claims are that the individual plaintiff in each case performed work under conditions and standards controlled by the Government and that the Government knew that proper performance of the sales contracts would benefit the Government.

The three Claims Court cases and the Sexton and Owen cases have the following factual allegations in common: 1) Johns-Manville manufactured asbestos-containing products in accordance with government-established specifications; 2) such manufacture and provision to the Government was mandated; 3) the Government participated in asbestos trade, stockpiling, and allocation; 4) the Government recognized the health hazards of over-exposure to asbestos, established standards of safe exposure, and failed to enforce those standards; 5) the Government did not inform Johns-Manville of the risks created by that failure; and 6) the Government exercised exclusive control of shipyards.[4]

## DISCUSSION

28 U.S.C. § 1500, in its current form, prohibits this court from acting on

> any claim for or in respect to which the plaintiff or his assignee has pending in any other court any suit or process against the United States or any person who, at the time when the cause of the action alleges such suit or process arose, was, in respect thereto, acting or professing to act, directly or indirectly under the authority of the United States.

Section 1500 was enacted over a century ago to avoid the maintenance of suits against the United States after a claimant failed to receive satisfaction from suing a cabinet officer. At that time there was no res judicata effect to such a judgment in a subsequent suit against the United States. *See* Schwartz, *Section 1500 of the Judicial Code and Duplicate Suits Against the Government and Its Agents*, 55 Geo.L.J. 573, 576–77 (1967) [hereinafter "Schwartz"].[5] In that context section 1500 properly has been viewed as an anachronism. *See A.C. Seaman, Inc. v. United States*, 5 Cl.Ct. 386, 389 (1984) (discussing section 1500 cases decided by the Court of Claims at 390). However, the original formulation of section 1500 that applied to pending actions against individuals was superseded in 1948. Since that date, it has not only reached suits against officers or agents of the United States, but also suits against the United States itself. The Court of Claims described this change as "a substantive change in the statute." *Tecon Eng'rs, Inc. v. United States*, 170 Ct.Cl. 389, 399, 343 F.2d 943, 949 (1965), *cert. denied*, 382 U.S. 976, 86 S.Ct. 545, 15 L.Ed.2d 468 (1966).

The Supreme Court had occasion to construe the earlier version of the statute that applied only to suits maintained against officers and agents of the United States. In *Corona Coal Co. v. United States*, 263 U.S. 537, 44 S.Ct. 156, 68 L.Ed. 431 (1924), plaintiff sued for a balance allegedly due under a contract for delivery of coal. The cognizant agency set a general price for coal higher than the contract price and the action had sought the difference. The Court of Claims dismissed the action because under applicable statute the case properly belonged in district court. Before the direct appeal to the Supreme Court, plaintiff filed suits in federal district courts against a government officer asserting the same cause of action as in the Court of Claims case. The Government moved to

---

**4.** Defendant also compared the facts alleged in the three Claims Court cases with the complaints in Sexton and Owen in Appendix C to its reply brief. *See supra* note 3.

**5.** The statute as originally enacted, Act of June 25, 1868, ch. 71, § 8, 15 Stat. 77, did not implement its stated purpose to give res judicata effect to judgments following unsuccessful lawsuits against officers or agents of the United States in later-filed suits in the Court of Claims. The statutory language applied only to actions "pending" in other courts. Thus, if a claimant sued a government officer or agent and the action was dismissed, the statute did not bar the subsequent prosecution of the same claim against the United States, because no duplicate claim against an officer or agent was then "pending." *See* Schwartz at 579.

dismiss the appeal based on an early version of section 1500, which then prevented either the Supreme Court or the Court of Claims from proceeding on

> any claim for or in respect to which he or any assignee of his has pending in any other court any suit or process against any person who, at the time when the cause of action alleged in such suit or process arose, was, in respect thereto, acting or professing to act, mediately or immediately, under the authorization of the United States.

Act of Mar. 3, 1911, ch. 231, § 154, 36 Stat. 1087, 1138.

Plaintiff argued before the Supreme Court, as Johns-Manville argues here, that the actions were filed out of necessity because they were about to become barred by expiration of the statutory period of limitations. In ruling that the predecessor to section 1500 barred the Supreme Court from exercising jurisdiction over an appeal of a Court of Claims decision where the same claim is pending in district courts, the Court stated unequivocally:

> But the words of the statute are plain, with nothing in the context to make their meaning doubtful; no room is left for construction, and we are not at liberty to add an exception in order to remove an apparent hardship in particular cases.

263 U.S. at 540, 44 S.Ct. at 156 (citations omitted).

The Supreme Court revisited old section 1500 in *Matson Navigation Co. v. United States*, 284 U.S. 352, 52 S.Ct. 162, 76 L.Ed. 336 (1932). The Court of Claims had dismissed a suit on the ground that petitioner had instituted suits against the United States on the same claim in district court after having commenced its action in the Court of Claims. The Supreme Court noted that the Government on appeal did not contend that the Court of Claims' jurisdiction was ousted by the pendency of the suits filed in district court. The Supreme Court remarked:

> Although ... [the suits] were not within the language of the section, they were nevertheless regarded as within its assumed purpose to prevent the prosecution at the same time of two suits against the Government for the same cause of action. But the declared purpose of the section ... was only to require an election between a suit in the Court of Claims and one brought in another court against an agent of the Government, in which the judgment would not be *res adjudicata* in a suit pending in the Court of Claims.... *As the words of the section are plain, we are not at liberty to add to or alter them to effect a purpose which does not appear on its face or from its legislative history. Corona Coal Co. v. United States*, 263 U.S. 537, 540 [44 S.Ct. 156, 156, 68 L.Ed. 431].

284 U.S. at 355–56, 52 S.Ct. at 164 (emphasis added; citations omitted). The import of this language was to condemn broadening the application of such a harsh statute based on the perception of its assumed purpose, as opposed to applying it strictly as drafted. However, in 1948 suits against the United States itself, as well as its officers or agents, were embraced within the limitation to the Court of Claims' jurisdiction. This amendment made the assumed purpose for the continued viability of old section 1500 its explicit language. The effect of this amendment is that *Corona Coal Co.* does not have diminished effect when asserted in an action involving a suit filed against the United States in another court after the same claim has been filed in this court. Undiminished, the effect of *Corona Coal Co.* is that the statute bars exercise of this court's jurisdiction when suit on the same claim is pending against the United States in another court.

*Tecon Engineers* held differently. The recalcitrant plaintiff in that case launched a last-ditch effort to avoid trial in the Court of Claims by filing an action against the United States in federal district court, then moving to dismiss without prejudice its claim in the Court of Claims. The court construed section 1500 to require dismissal of the Court of Claims action only if the same claim had been filed in another court before the Court of Claims action was commenced. The court distinguished *Corona Coal Co.* as a case involving the appellate

jurisdiction of the Supreme Court and observed, "[T]here is no indication that the issue of priority was ever fully briefed, considered or decided...." 170 Cl.Ct. at 401 & nn. 6–7, 343 F.2d at 950 & nn. 6–7 (noting particularly the *Corona* briefs in the Supreme Court). However, although later-filed suits were not within the reach of section 1500, according to *Tecon Engineers*, the court suggested that suits filed simultaneously with Court of Claims actions were subject to the section 1500 election. *See Tecon Engineers*, 170 Ct.Cl. at 400–01 & n. 4, 343 F.2d at 950 & n. 4 (citing *Hobbs v. United States*, 168 Ct.Cl. 646 (1946) (suit filed one day later in district court barred jurisdiction on earlier-filed Court of Claims suit)).

The narrow holding of *Tecon Engineers* is that section 1500 cannot be used tactically by a party invoking this court's jurisdiction to prevent the court from acting on its claim. Johns-Manville does not attempt to utilize section 1500 for tactical advantage; in fact, its stated commitment is to try its case in this court. Defendant, instead, invokes section 1500 as a shield from the onus of defending against the same claims for the same relief at the same time in different courts. This is the purpose of section 1500. *See Wessel, Duval & Co. v. United States*, 129 Ct.Cl. 464, 465, 124 F.Supp. 636, 637–38 (1954); *Frantz Equip. Co. v. United States*, 120 Ct.Cl. 312, 314, 98 F.Supp. 579, 580 (1951).

1. *Claims filed before suit commenced in Claims Court*

■ Whether *Tecon Engineers* was overbroad, any infirmity lies only in its holding concerning suits filed after an action has been commenced in the Claims Court. *Tecon Engineers* and the other case law on section 1500 establish that an earlier-filed suit deprives the Claims Court of jurisdiction over an action on the same claim filed later in the Claims Court. Here, *Johns-Manville Sales Corp. v. United States*, No. C–81–4561 RFP, was filed in the Northern District of California in 1981, and Johns-Manville's cases No. 465–83C, 688–83C, and 1–84C were filed in the Claims Court during 1983 and 1984.

Johns-Manville makes a forceful argument that the claims pending against the United States in the Robinson case are not duplicative of any claims scheduled for trial in No. 465–83C. Johns-Manville technically is correct. The claim for indemnity in the Robinson case is specific to facts surrounding Johns-Manville's ultimate satisfaction by settlement of a potential liability to shipyard worker Mr. Robinson, whereas liabilities incurred on the basis of other named test claimants will be tried in the Claims Court World War II cases. Johns-Manville contends, further, that by its pleadings in *Eagle-Picher Industries, Inc.*, No. 170–83C, defendant manifested general assent with Johns-Manville's position, because defendant argued on its motion in the nature of a motion for more definite statement that without more particulars as to the identity of the claimants and the amount of their settlements and judgments, defendant was not in a position to judge whether section 1500 would be applicable.

In its present motion, defendant takes a more generous view of what constitutes a claim, arguing that a different theory of relief (contract versus tort) does not create a different claim or cause of action for purposes of section 1500 as long as the operative facts and the type of relief sought are the same. In *Dwyer v. United States*, 7 Cl.Ct. 565 (1985), this court held that section 1500 forces a claimant to elect between a contract and tort action if both can be said to be based on the same underlying facts. This holding was based on *British American Tobacco Co. v. United States*, 89 Ct.Cl. 438, 440 (1939) (per curiam), *cert. denied*, 310 U.S. 627, 60 S.Ct. 974, 84 L.Ed. 1398 (1940) (operative facts setting up liability in both tort and contract constitute same claims although theory of relief different); *National Cored Forgings Co. v. United States*, 132 Ct.Cl. 11, 19–20, 132 F.Supp. 454, 959 (1955) (plaintiff is not divested of necessity of electing between forums by bringing same claim in Court of Claims against the United States and in district court against a government corporation acting within its statutory authority); and *Los Angeles Shipbuilding & Dry-*

*dock Corp. v. United States,* 138 Ct.Cl. 648, 652, 152 F.Supp. 236, 238 (1957) (claim based on an account stated in Court of Claims and tax refund claim in district court are the same claim since both seek refund of overpaid taxes). These cases stand for the proposition that a claim or cause of action is not equated to a theory of relief. Consequently, a suit in tort or contract can be the same claim or cause of action irrespective of the theory of relief urged in contract or tort, as long as it arises with respect to the same operative facts and asks for monetary relief. The discussion in *Dwyer* follows:

The statute employs the terms claim and cause of action synonymously. ("The ... Claims Court shall not have jurisdiction *of any claim* [in which there is pending a suit against the Government or a person] who, at the time when *the cause of action ...* arose [was acting under authority of the United States].") The term "cause of action" was equated to "claim" in *British American Tobacco Co. v. United States,* 89 Ct.Cl. 438 (1939) (per curiam), *cert. denied,* 310 U.S. 627, 60 S.Ct. 974, 84 L.Ed. 1498 (1940), upholding section 1500's bar when plaintiff brought a contract claim in the Court of Claims after suing unsuccessfully on a tort claim in district court:

A recital of the operative facts relied upon by a claimant does not state two separate and distinct causes of action merely because such facts may set up a liability both in tort and contract. The terms "conversion" used in the suit in the District Court and "taking of property without just compensation" in the suit in this court were obviously used by plaintiff for the purpose of attempting to adapt the single claim to the jurisdiction of the different courts in which the claim was being urged, but the use of these terms does not obscure the unity or sameness of the claim. We think it is clear that the word "claim," as used in section 154, *supra,* has no reference to the legal theory upon which a claimant seeks to enforce his demand if it appears, as it does here, that the defend-ant in a suit in another court was, in respect of the subject matter or property in respect of which the claim was made, acting mediately or immediately upon the authority of the United States. The terms of section 154 refer to a claim "for or in respect of which" another suit is pending....

89 Ct.Cl. at 440. The import of *British American* is that a suit in tort and contract can be the same claim or cause of action, irrespective of the theory of relief urged, if it arises with respect to the same operative facts, even if the contract claim, because of its value, could not have been maintained in district court.

*National Cored Forgings Co., Inc. v. United States,* 132 Ct.Cl. 11, 19–20, 132 F.Supp. 454, 459 (1955), again construed section 1500 as disallowing a suit when the "same cause of action or claim" is pending in district court. In *Los Angeles Shipbuilding & Drydock Corp. v. United States,* 138 Ct.Cl. 648, 152 F.Supp. 236 (1957), a tax case, the Court of Claims dismissed a claim for an account stated in a different amount than suits covering the same tax years brought in two federal district courts on the theory of overpayment. "The *claim* involved is ... before both courts. The theory advanced to sustain the *claim* is quite another matter and not determinative of the jurisdiction of this court." 138 Ct.Cl. at 652, 152 F.Supp. at 238. Nevertheless, the court remarked:

The plaintiff could have pursued its claim on the theory of account stated alternatively to its other theories of recovery in the District Court or in the Court of Claims. Either course of action was available to plaintiff. It made its choice of the tribunal desired, the District Court, and therefore cannot now be heard in this court.

*Id.,* 138 Ct.Cl. at 652, 152 F.Supp. at 238. Because *Los Angeles Shipbuilding* was a tax case, no monetary jurisdictional bar would have prevented plaintiff from bringing a two-count complaint in district court in the first place. Under *British American,* however, maintenance of a

suit in the Claims Court would not depend on whether the claim or cause of action could be heard in district court. 7 Cl.Ct. at 568–69 (emphasis in original). *But see Allied Materials & Equip. Co. v. United States,* 210 Ct.Cl. 714 (1976) (section 1500 motion denied when district court action including count for tortious interference with performance of contract pending, although same facts pleaded in action for breach of contract in Court of Claims).

One need look no further than *Corona Coal Co.* for corroboration of the view that a homogeneity of operative facts renders claims the same for purposes of section 1500. The Supreme Court characterized causes of action as the same because they arose out of the President's use and operation of certain railroads. Appellant had contracted with railroads for the supply of coal; thereafter these railroads came under government control, and the Railroad Administration claimed the right to enforce the contracts. When the right was denied, the Fuel Administration requisitioned the coal without prejudice to appellant to claim against the Railroad Administration or the railroad companies. The Supreme Court in *Corona Coal Co.* described both the case in the Claims Court seeking the balance due under the contracts and the subsequent actions against the President's Agent under the 1920 Transportation Act as arising out of "the possession, use and operation by the President of the railroads in question and ... [coming] within the provisions ... [of the Transportation Act]". 263 U.S. at 539, 44 S.Ct. at 156.

The Robinson case involves, *inter alia,* a theory of relief based on a special relationship between Johns-Manville and the Government. This special relationship, in turn is based on, *inter alia,* government-promulgated specifications and the Government's superior knowledge in connection with Johns-Manville's performance of contracts with the Government for asbestos-containing products during World War II. The operative facts in No. 465–83C overlap those in the Robinson case, except that the Robinson case involves sales by Johns-Manville beyond the World War II years, and Mr. Robinson was exposed to asbestos-con-

taining products only in the 1960's. The Claims Court World War II case seeks indemnification only for exposures that occurred during the war years. Johns-Manville alleges, however, that the asbestos-containing products to which Mr. Robinson was exposed were installed during World War II. It matters not that Johns-Manville must sponsor individual indemnity claims in both actions in order to recover damages indemnifying it for specific judgments and settlements. The same operative facts during World War II precipitating the diseases or deaths for which Johns-Manville has been held liable or settled in Claims Court No. 465–83C overlap the facts alleged in the Robinson case as the basis for the special relationship with Johns-Manville whereby the Government assumed responsibility for the asbestos-containing products that Mr. Robinson removed in the 1960's. Parallel to the description in *Corona Coal Co.,* both cases involve claims arising out of the Government's specifications for asbestos-containing products and the Government's unique knowledge of the dangers or risks of exposure to asbestos, including government knowledge of its enforcement of its safety standards in shipyards. *See Johns-Manville Corp. v. United States,* No. 465–83C, slip op. at 35–37, 41 (Cl.Ct. Mar. 6, 1987). Overlapping operative facts support claims or causes of action that can sound in tort, as well as contract. The theories of relief differ, but the claims are the same.

■ 28 U.S.C. § 1500 thus reaches different theories of relief if the facts underlying the claims are the same and the same type of relief, *i.e.,* monetary, is sought. For example, in the Robinson case Johns-Manville has made so-called "vessel-owner" claims against the United States. These arise under the Federal Tort Claims Act and are based on the Government's duties as vessel owner to maintain its ships in safe condition; to avoid exposing persons aboard to unsafe conditions within the vessel owner's control; and to warn persons aboard about hidden hazards. These duties do not arise out of the contractual relationships at issue in the Claims Court litigation;

but the facts that may spell their breach are the same facts alleged as a basis for the breaches pleaded in Johns-Manville's Claims Court complaints.

Johns-Manville argues that if all the averments (operative facts) in the Robinson case dealing with the World War II years that duplicate Claims Court No. 465–83C were excised, a viable cause of action would remain. Johns-Manville refers to the facts dealing with the relationship of Johns-Manville and the Government after World War II. However, Claims Court No. 688–83C picks up that refrain, and Claims Court No. 1–84C makes the same factual allegations respecting the Johns-Manville-Government relationship that may account for exposures occurring other than exclusively during World War II or the early 1960's. In essence the Robinson case spans Claims Court Nos. 465–83C, 688–83C, and 1–84C, except that the Claims Court litigation was filed as three cases and Mr. Robinson is one claimant who was exposed to asbestos only in the 1960's.

It is also asserted that the Robinson case presents later-filed claims in that the original complaint was dismissed as to all claims other than a taking claim as of the date Johns-Manville filed No. 465–83C in the Claims Court. The facts pleaded in the original complaint are pleaded separately from the recitation of claims. Johns-Manville's argument is typically well-crafted, but it would eviscerate the doctrine of relation back of claims to hold that claims set up in an amended complaint do not relate back to the date the original complaint was filed. Johns-Manville argues further that the Federal Tort claims were dismissed as legal non-entities for failure to file administrative claims. Once the claims were denied, Johns-Manville had two years to sue under the Federal Tort Claims Act. This is true, but instead of commencing a new Robinson suit, the counts were added back into the 1981 action, and the operative facts pleaded in 1981 and in the perfected counts

were much the same. As defendant points out, Johns-Manville's Torts Claims Act claims were not ripe insofar as legal theories in 1981, but the facts giving rise to the claims existed and were pleaded in a pending complaint.

According to Johns-Manville, the Robinson case was structured precisely to avoid presenting same claims as the later three Claims Court cases. It is true that Mr. Robinson is not an underlying claimant in any of the three Claims Court suits.[6] This argument confuses the concept of operative facts with secondary facts, if a term may be coined. Johns-Manville could not sue for indemnification absent one or more identified individuals to whom money has been paid by way of settlement or judgment. The cause of action for indemnification only arises when such a claim has been paid. *See, e.g., Garza v. Arizona Ref. Co.,* 634 F.Supp. 959, 962 (S.D.Tex.1986); (s.a.r.l.) *Orliac v. Winebow, Inc.,* 595 F.Supp. 470, 473 (S.D.N.Y.1984). Damages are claimed based on the judgments, reasonable costs of settlement, and reasonable expenses.[7] But this does not mean that each claimant sets up unique operative facts in respect of the 1) relationship of Johns-Manville and the Government and 2) the conduct of the principals leading up to and involved in the claimant's exposure and injuries. That the shipyards, contracts, and claimants differ is not significant, as shown by the fact that the World War II cases are being tried on the basis of test claimants and shipyards. The solid weight of facts to be proved at trial of No. 465–83C, according to the parties' proposed findings, is covered by these two general descriptions. The claimant-specific facts are few and incidental. Even though in any subsequent damages trial claimant-specific facts may have more import, they do not constitute the gravity of facts required to present Johns-Manville's claims for government liability.

In *Los Angeles Shipbuilding & Drydock Corp. v. United States,* 138 Ct.Cl. 648, 152 F.Supp. 236, defendant moved for judg-

---

6. Johns-Manville says that Mr. Robinson was inadvertently listed as an underlying claimant in No. 1–84C, and the court accepts the representation.

7. The Claims Court litigation involves many claims that yet have not been settled or reduced to judgment.

ment on the pleadings in part for lack of jurisdiction of subject matter under 28 U.S.C. § 1500. Plaintiff was claiming entitlement to a return of overpayments of taxes for years 1940–1941 and 1943 based on the theory of an account stated growing out of an initial agreement between plaintiff and the IRS as to the amount of the overpayment and the means by which plaintiff would be credited for that amount, which the IRS later repudiated. At the time the Court of Claims was considering this motion, plaintiff had two suits pending in federal district court, one suit against the United States and the other against the District Director of Internal Revenue Service based on theories of overpayment of taxes and wrongful refusal to refund overpayments made in 1940, 1942, 1943, and 1946, respectively. The Court of Claims determined that the amount of tax overpayment sought in that court was "entirely included within the plaintiff's claims in one or both of the suits in the District Court." 138 Ct.Cl. at 651, 152 F.Supp. at 237. Although, as plaintiff pointed out, proofs in the Court of Claims action would differ from those in district court because of differences in years covered and in theories, the Court of Claims dismissed the action since, at bottom, both suits concerned whether plaintiff had overpaid taxes, and the years at issue in the Court of Claims action were included within the district court actions. Thus, since the matters at issue in the Court of Claims were subsumed within the district court actions, the court determined that plaintiff had elected to proceed in district court and would not hear the case.

What Johns-Manville seeks to obtain in the Robinson case is, of course, a victory, but more importantly, a basis to collaterally estop the Government on the operative facts in subsequent litigation. The Claims Court cases are test cases. Johns-Manville

will be bound by the findings on liability in respect of the so-called test claimants for all of its actual and potential claims arising out of World War II exposure, although the complaint refers to only 56 suits that had been settled and 327 suits pending at the time the case was filed. Johns-Manville receives substantial benefits by proceeding with test cases. For example, it need not prove that contingency reserves or insurance premiums were considered a cost of performance for every contract with the Government during the World War II years for the supply of asbestos-containing products to all the shipyards wherein the underlying claimants worked. Rather, Johns-Manville can attempt to prove by a preponderance of evidence that the Government adopted a self-insurance policy in its overall contractual relationship with Johns-Manville. By culling the Robinson case out of the Claims Court litigation, Johns-Manville seeks an opportunity to try as a tort the same operative facts that are before the Claims Court in at least Nos. 465–83C (over 300 claims) and 688–83C (over 1,200 claims). If section 1500 could not reach this situation, the result would be that in any multiple-claimant situation, the Government would always be put to duplicate defense in the Claims Court and in other courts. If section 1500 has any utility, it should be to force election between this court and others for massive litigation like the instant asbestos cases that can only be handled on a test-case basis.

Section 1500 applies, as well, to Johns-Manville's previously filed third-party actions. The third-party actions plead the same operative facts underlying both the Government's specifications and knowledge of shipyard conditions and the Government's alleged duties to exercise care, supervise, and warn concerning the use of asbestos-containing products in shipyards.[8]

8. Johns-Manville argues with respect to third-party suits filed both before and after commencement of its Claims Court action that section 1500 should apply only to direct suits because its third-party suits are not voluntary. This argument is rejected based on *Frantz Equip. Co. v. United States*, 120 Ct.Cl. 312, 98 F.Supp. 579 (1951), wherein it was decided that

plaintiff's previously filed counterclaim in district court precluded a later suit in the Court of Claims on the same claim against the United States. A third-party complaint lacks voluntariness in much the same way as a counterclaim. A counterclaim must be pleaded in any appropriate action. Although a third-party plaintiff is not mandated to sue the third party, and a

This court ruled in *Dwyer v. United States*, 7 Cl.Ct. 565, that the issue on a motion under section 1500 is whether the Claims Court is deprived of jurisdiction of an action when the same claim asking for the same relief is pending in another court, not whether a stay of an action coming within the jurisdiction of the Claims Court is appropriate. 7 Cl.Ct. at 567 (citing *National Bank of Detroit v. United States*, 1 Cl.Ct. 712 (1983) (order denying motion for stay of proceedings)). Other decisions have taken a different view, *see, e.g., Prillman v. United States*, 220 Ct.Cl. 677, 679, 652 F.2d 70 (1979); *Arizona Helicopters, Inc. v. United States*, 4 Cl.Ct. 662, 666 (1984), but no jurist contends that the statutory language calls for less than dismissal.

■ As originally enacted, however, section 1500 contained a proviso to mitigate the hardship of requiring a party to abandon litigation pending in other courts. The Act of June 25, 1868, ch. 71, § 8, 15 Stat. 77, barred prosecution of a claim in the Court of Claims unless the pending claim "if now pending in such other court, shall be withdrawn or dismissed within thirty days after the passage of this act." There is no reason why the same election should not be extended Johns-Manville, given the exquisitely poor timing of defendant's motion less than two months before a six-week trial was to commence. Accordingly, Johns-Manville will be given 60 days to

start the process or obtain dismissal of the Robinson case and its third-party cases. *See Brown v. United States*, 175 Ct.Cl. 343, 358 F.2d 1002 (1966) (vacating earlier dismissal based on section 1500 and exercising jurisdiction over claim since offending claim had been dismissed by the district court and time for appeal had run).[9]

### 2. Claims filed after suit commenced in Claims Court

Johns-Manville filed the Sexton and Owen cases after filing its three Claims Court cases. The application of section 1500 to bar jurisdiction over Claims Court suits on the same claims as have been asserted in later-filed, pending suits in other courts begins with an analysis of its statutory language. "Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Park 'N Fly v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194, 105 S.Ct. 658, 662, 83 L.Ed.2d 582 (1985) (citation omitted). The Federal Circuit has followed the Supreme Court's direction in *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917), that if "the language is plain and admits of no more than one meaning, the duty of interpretation does not arise and the rules which are to aid doubtful meanings need no discus-

---

direct action can accomplish the same result, third-party practice is encouraged to avoid piecemeal litigation.

**9.** The additional arguments made by plaintiffs other than Johns-Manville have not been addressed, except regarding the effort to give law of the case effect to the 1981 *Keene* and 1983 *Eagle-Picher* orders and regarding an argument particularized by Eagle-Picher concerning vessel owner claims. One argument made principally by GAF Corporation ("GAF") is noted because it has a first-blush appeal. GAF marshals numerous statutes, *e.g.,* 28 U.S.C. § 1332 (1982), governing diversity jurisdiction, for the proposition that once jurisdiction attaches subsequent acts of the parties cannot divest it. Thus, withdrawal of a party does not defeat diversity. From this GAF argues that on the date it filed in the Claims Court no other claim on the same operative facts was pending against the United States and that, therefore, jurisdiction attached on the

date its contract actions was filed and cannot be defeated by its filing, one day later, a tort action based on the same operative facts.

28 U.S.C. § 1332, and most of the other statutes cited by GAF, determines the court in which an action is to proceed. Section 1500 prohibits the maintenance of an action in the Claims Court if an action on the same operative facts is pending elsewhere. The purposes of these statutes differ. More fundamentally, GAF's argument invites the manipulative tactics condemned in *Tecon Engineers*. Under GAF's reasoning, a party could file an action in district court, then another action in the Claims Court, then amend its district court complaint to add a count pleading facts and a tort theory of relief that otherwise duplicated the Claims Court claim and not run afoul of 28 U.S.C. § 1500. For these reasons GAF's argument is rejected.

sion." *See Lehman v. Dow Jones & Co.,* 783 F.2d 285, 292 (2d Cir.1986).

■ The unambiguous language of section 1500 calls for a literal interpretation: Jurisdiction of the Claims Court is foreclosed over "any claim for or in respect to which the plaintiff ... has pending in any other court any suit ... against the United States." Section 1500 divests this court of jurisdiction whenever another suit has been brought on the same claim—irrespective of whether the second suit is filed before or after the Claims Court action. As long as the second suit is pending, the Claims Court must relinquish jurisdiction. The meaning is rational because Congress reasonably could have acted to avoid taxing the fisc with the costs of defending against the same claim in multiple courts. Moreover, Congress reasonably could have assured by statute that the rule of comity be obligatory whenever suits on the same claim were pending in the Claims Court and other courts. What Congress obtained by the language of section 1500 was to make certain that a claimant could not avail itself of the Claims Court, the court empowered to hear most contract claims against the United States, if it sued on the same claim in another court. Since the rule of comity does not guarantee forbearance,[10] Congress sought by section 1500's language to prevent suits on the same claims, although the theories of relief themselves might not be the same.

Slavish adherence to plain meaning "on a purely linguistic level" is not required if the interpretation of unambiguous language "does not do justice to the realities of the situation." *Texas State Comm'n for the Blind v. United States,* 796 F.2d 400, 406 (Fed.Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 874, 93 L.Ed.2d 828 (1987). The Federal Circuit quoted *Church of the Holy Trinity v. United States,* 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892), for the " 'familiar rule that a thing may be within the letter of the statute, but not within its spirit nor within the intention of its makers.' " 796 F.2d at *id;* *see also Institut Pasteur v. United States,* 814 F.2d 624, 627 at 6 (Fed.Cir.1987). *But see Texas State Comm'n,* 796 F.2d at 417 (dissenting op.). Judge Archer in *Reid v. Department of Commerce,* 793 F.2d 277, 281–82 (Fed.Cir.1986), said that a court should not look under the plain meaning of unambiguous language to devine the real purpose of Congress

unless a literal interpretation would lead to an incongruous result. For example, if a literal reading of the statute would impute to Congress an irrational purpose, *United States v. Bryan,* 339 U.S.

---

**10.** The comity doctrine is an equitable doctrine used by federal courts to avoid duplicative litigation where the same parties and issues are before two or more courts with concurrent jurisdiction. *See Great Northern Ry. v. National RR. Adjustment Bd.,* 422 F.2d 1187 (7th Cir. 1970). Normally the "first filed" complaint will be allowed to proceed, while the second court will stay its hand. However, the Supreme Court in *Kerotest Mfg. Co. v. C–O–Two Fire Equip. Co.,* 342 U.S. 180, 72 S.Ct. 219, 96 L.Ed. 200 (1952), held that the "first filed" rule was not one of rigid construction and approved dismissal of a complaint which first acquired jurisdiction where the second litigation would best resolve all the issues:

Wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation, does not counsel rigid mechanical solution of such problems. The factors relevant to wise administration here are equitable in nature. Necessarily, an ample degree of discretion, appropriate for disciplined and experienced judges, must be left to the lower courts....

342 U.S. at 183–84, 72 S.Ct. at 221.

The Ninth Circuit addressed the comity doctrine in the context of federal docket overcrowding in *Crawford v. Bell,* 599 F.2d 890, 893 (9th Cir.1979), noting that "increasing calendar congestion in the federal courts makes it imperative to avoid concurrent litigation in more than one forum whenever consistent with the rights of the parties." Judicial efficiency sometimes is best served by dismissal of the "first filed" action. In *Pacesetter Systems, Inc. v. Meltronic, Inc.,* 678 F.2d 93, 95 (9th Cir.1982), the court explained that "[the] 'first to file' rule is not a rigid or inflexible rule to be mechanically applied, but rather is to be applied with a view to the dictates of sound judicial administration." *See also Orthman v. Apple River Campground, Inc.,* 765 F.2d 119 (8th Cir.1985); *cf. Mann Mfg., Inc. v. Hortex, Inc.,* 439 F.2d 403 (5th Cir.1971) (absent compelling circumstances, the court initially seized of a controversy should be the one to decide it).

323, 338, 70 S.Ct. 724, 734, 94 L.Ed. 884 (1950), or would thwart the obvious purpose of the statute, *Trans Alaska Pipeline Rate Cases*, 436 U.S. 631, 643, 98 S.Ct. 2053, 2061, 56 L.Ed.2d 591 (1978), or would lead to a result at variance with the policy of the legislation as a whole, *Trustee of Indiana University v. United States*, 618 F.2d 736, 739, 233 Ct.Cl. 88, 94 (1980), then literal interpretation will be eschewed in favor of resort to the legislative history to ascertain the intent of Congress. *United States v. Oregon*, 366 U.S. at 648, 81 S.Ct. at 1281; 2A Sands § 46.07.

However, interpretation of the statute beyond its clear language to discern a statutory purpose at variance with its terms must disclose a "clearly expressed legislative intent to the contrary." *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). It is submitted that the legislative intent behind the current version of 28 U.S.C. § 1500 cannot be described as clear or clearly expressed. Rather, it is inferential, and the stronger inference is consistent with judicial deference to the unambiguous language of the statute.

Unquestionably, Congress enacted section 1500 to insulate the United States from suits filed by claimants who had been unsuccessful in actions against officers or agents of the United States. The Court of Claims in *Tecon Engineers* made a careful textual analysis of statutory language and legislative history, concluding that the vice Congress guarded against was previously filed lawsuits, not actions commenced after jurisdiction of the Court of Claims attached. *See* 170 Ct.Cl. at 399–400, 343 F.2d at 949. In reaching its conclusion, the court pointed to changes in statutory language that excised language from the orig-

inal statute. In 1868 the statute disallowed prosecution of suits in the Court of Claims if the claimant "shall have commenced and has pending any suit ... in any other court" in respect of the same claim. In 1874 the words "shall have commenced and" were deleted, so that the statute read, as it does now, "has pending in any other court any suit." *See id.* at 397, 343 F.2d at 948. The Court of Claims quoted legislative history to the effect that this revision did not attempt to change the law. *See id.* at 398, 343 F.2d at 948–49.

What occurred next was a "substantive change," as so described by the Court of Claims, *id.* at 399, 343 F.2d at 349, when in 1948 Congress added the United States as a party defendant.[11] However, the legislative history once again characterized the change as a "change in phraseology." H.R.Rep. No. 308, 80th Cong., 1st Sess. A 140 (1947), *reprinted in* U.S.Code Cong. Serv., 80th Cong., 2d Sess. 1862 (1948) [hereinafter "House Report"]. A court has three choices at this juncture. One is to read the new language consistently with the original statutory purpose; the second is to investigate further to see what the change means in view of developments since the statute was enacted; the third is to read the unambiguous language without further interpretation.

The Court of Claims in *Tecon Engineers* took the first approach. It reasoned that since the original purpose of old section 1500 was to give res judicata effect to lawsuits against government officers and agents in actions against the United States filed after the suits had been lost, the addition of the United States did "not change the legal effect" of the statute on the question of whether section 1500 applied to suits filed in other courts after an action on the same claim had been initiated in the

---

**11.** In the 1948 amendment, Congress also deleted the phrase "or in the Supreme Court on appeal therefrom," indicating that the language was "unnecessary." House Report at A 140, *reprinted in* 1948 U.S.Code Cong.Serv. 1862. The effect of the change was to eliminate the section 1500 limitation on Supreme Court proceedings, so that, if an action was filed in district court after the Court of Claims dismissed the same claim, the Supreme Court could entertain an appeal of the Court of Claims decision. That the Supreme Court's decision in *Corona Coal* was premised on this now defunct language does not detract from its viability, as the identical language construed by the Court applied to the Court of Claims at that time and still does.

Court of Claims. 170 Ct.Cl. at 399, 343 F.2d at 349.

This court respectfully offers the view that the second or third approach would have yielded a more appropriate result. *See* Schwartz, 55 Geo.L.Rev. at 573–74. The Supreme Court in *Corona Coal* in 1924 had dismissed an appeal against the United States because suits had been filed against a government agent after a Court of Claims decision on the same claims. Some years later in *Matson Navigation* the Court of Claims dismissed a petition after a suit on the same claim had been filed against the United States (not a government officer or agent) in district court. The addition of the United States as a party defendant by the 1948 amendment can be viewed as a response by Congress consistent with the Supreme Court's criticism in *Matson Navigation* of the Court of Claims' dismissal because the "assumed purpose" (not the stated purpose) of old section 1500 was "to prevent the prosecution at the same time of two suits against the Government for the same cause of action." 284 U.S. at 355, 52 S.Ct. at 164. The scant legislative history of the 1948 amendments gives no indication of the purpose of the addition of "the United States," stating only that "[c]hanges were made in phraseology." House Report at A 140, *reprinted in* 1948 U.S.Code Cong.Serv.1862. *Schwartz*, however, sees more significance in the change. "The revisers seem plainly to have intended to overrule ..." Matson, *Schwartz* at 580, so that the "assumed purpose" became the actual effect.

It is as plausible that Congress added the United States as a party defendant to rectify the *Matson Navigation* criticism as it is plausible that the added language—what the Court of Claims referred to as the "substantive change"—was surplusage. Moreover, before the issuance of its opinion in *Tecon Engineers*, the Court of Claims at least twice took the position that the purpose of the statute was, consistent with the "assumed purpose" of *Matson Navigation*, to avoid duplicative litigation in the same court at the same time. *Wessel, Duval & Co. v. United States*, 129 Ct.Cl. at 465–66, 124 F.Supp. at 637–38;

*Frantz Equip Co. v. United States*, 120 Ct.Cl. at 314, 98 F.Supp. at 580.

In fact, the only way to give all the terms of section 1500 effect is to ascribe the *Matson Navigation* assumed purpose to be the statute's current purpose. If the original statutory purpose in 1868 is assumed valid, *i.e.*, to give res judicata effect to failed lawsuits, it makes no sense for the statute to be revised to give res judicata effect to lawsuits against the United States in actions later filed against the United States. Res judicata always applied to actions in respect of the same parties. Rather, the addition of the "United States" meant simply what the language said: A claim could not proceed in the Court of Claims if it was pending elsewhere against the United States. And if this is a correct reading of section 1500, restricting its reach only to suits filed prior to Court of Claims or Claims Court suits makes no sense. Whether a suit on the same claim is filed before or after an action in the Court of Claims or Claims Court, the Government's defense of it involves duplicative effort. The wisdom of the Framers may not be imputed to congressional enactments, but a statute should not be read to yield a nonsensical legislative purpose. Finally, it should be emphasized that *Tecon Engineers* reached its holding on the basis that addition of the "United States" to the statutory language was not material. *Tecon Engineers* could not have held as it did had effect been given to the added language.

■ The Court of Claims could have achieved the salubrious narrow holding of *Tecon Engineers*—that a plaintiff cannot use section 1500 to manipulate the Court of Claims' jurisdiction—without ruling broadly that section 1500 applies only to an action commenced before suit on the same claim is filed in the Court of Claims. *See Universal Fiberglass Corp. v. United States*, 210 Ct.Cl. 206, 218, 537 F.2d 393, 399 (1976) (United States allowed to pursue counterclaim in Court of Claims identical to claim pending in district court because section 1500 "applies to any claim which the *plaintiff* has pending in another court"

(emphasis in original)). However, because the holding of *Tecon Engineers* squarely reaches the cases at bar and because it is a published opinion of the Court of Claims, *see South Corp. v. United States*, 690 F.2d 1368, 1369 (Fed.Cir.1982); *Connolly v. United States*, 1 Cl.Ct. 312, 323, 554 F.Supp. 1250 (1982), *rev'd on other grounds*, 716 F.2d 882 (Fed.Cir.1983); General Order No. 1(1), 1 Cl.Ct. XXI (1982), denial of defendant's motions is commanded with respect to the same claims sued on in other courts after Johns-Manville began process in the Claims Court. This court believes that the Federal Circuit should reconsider and modify *Tecon Engineers* to reach a result more harmonious with the language of section 1500. Congress should have taken occasion in the 20 years since Sr. Judge Schwartz wrote his provocative article to redress the problems with section 1500. That the legislature has not acted does not signify that the statute can, or should, be ignored or construed to allow judicial forbearance. The statute is on the books; it makes sense; and it accomplishes a worthwhile purpose in this era of multi-jurisdiction duplicative litigation.

Finally, even if *Tecon Engineers* were not binding authority, this court would deny defendant's motion regarding later-filed suits. If *Tecon Engineers* is no longer to be the rule, the change should be prospective. Reliance of plaintiffs in the asbestos cases on *Tecon Engineers* was not frivolous. The decision has been followed repeatedly and without question by the Court of Claims and Claims Court. Moreover, the statutory directive of section 1500 is to relieve the Government from duplicative litigation. Defendant knew as early as 1980 that it had an argument to make concerning later-filed cases that flew in the face of *Tecon Engineers*. Section 1500 is intended to conserve the Government's resources, not to punish claimants. Defendant's litigation tactics should not lose sight of the former objective.

## CONCLUSION

Accordingly, based on the foregoing,

IT IS ORDERED, as follows:

1. Defendant's motion to dismiss Nos. 465–83C, 688–83C, and 1–84C is granted on the basis of earlier-filed claims pending in district courts, and the Clerk of the Court shall dismiss the complaints on June 5, 1987, unless by that date Johns-Manville has filed a Status Report indicating that it has obtained the dismissal, or has submitted motions for dismissal or proposed orders of dismissal, of the Robinson complaint and all third-party complaints against the United States pending in the Eastern District of Virginia. Defendant's motion is denied with respect to the Sexton and Owen cases.

2. Pursuant to 28 U.S.C. § 1292(d)(2) (1982), the court is of the view that the issues of whether 28 U.S.C. § 1500 prevents the Claims Court from exercising jurisdiction of 1) the same claims pending against the United States in the Robinson and third-party cases in the Eastern District of Virginia that were filed before Nos. 465–83C, 688–83C, and 1–84C; and 2) the same claims pending against the United States in the Sexton and Owen cases that were filed after Nos. 465–83C, 688–83C, and 1–84C, including whether *Tecon Engineers* should be reconsidered on point, present controlling questions of law with respect to which there is substantial ground for difference of opinion. An immediate appeal from this order materially will advance the ultimate termination of the asbestos litigation if the appellate court affirms the court's order and plaintiffs in other asbestos cases elect to dismiss their Claims Court litigation. Although Johns-Manville has manifested its commitment to the Claims Court litigation if this court's order is affirmed, an immediate appeal materially will advance the termination of Johns-Manville's litigation in district courts should this court's order be affirmed. This court also is of the view that a stay of the order entered by ¶ 1 pending decision of the Federal Circuit would be in the interest of justice in that Johns-Manville would be prejudiced if it dismissed with prejudice the Robinson and third-party cases in advance of obtaining appellate review.

3. Any motion to certify pursuant to ¶ 2 hereof shall not affect the pretrial and trial schedule in No. 465–83C. The Department of Justice has represented that it will not seek a writ of mandamus to prevent trial from commencing in No. 465–83C.